P.N. and G.N., individually and on behalf of their minor son, J.N., Plaintiffs,

v.

Daniel GRECO, The Windsor School, Ridgewood Board of Education, John Campion, the New Jersey Department of Education, and David Hespe, Commissioner of the New Jersey Department of Education, Defendants,

and

Daniel Greco, The Windsor School, Third–Party Plaintiffs,

v.

Federal Insurance Company, The Chubb Corporation and Chubb Group of Insurance Companies, Third–Party Defendants.

Civ. No. 00–6179(DRD).

United States District Court, D. New Jersey.

Sept. 23, 2003.

Cole, Schotz, Meisel, Forman, & Leonard, A Professional Corporation, Hackensack, NJ, Of Counsel and on the Brief, Rebecca K. Spar, Esq., On the Brief, Wendy L. Klein, Esq., for Plaintiffs, P.N. and G.N. o/b/o J.N.

Fogarty & Hara, Esqs., Fair Lawn, NJ, Of Counsel, Debra Shannon, Esq., for Defendants/Third Party Plaintiffs Daniel Greco and The Windsor School.

Sills Cummis Radin Tischman Epstein & Gross, P.A., Newark, NJ, Of Counsel and on the Brief, Philip E. Stern, Esq., On the Brief, Ruth M. Ruggero, Esq., for Defendant Ridgewood Board of Education.

Dwyer, Connell & Lisbona, Fairfield, NJ, Of Counsel and on the Brief, Donald T. Okner, Esq., On the Brief, Lynn A. Lisbona, Esq., for Defendant John Campion.

## *OPINION*

DEBEVOISE, Senior District Judge.

Plaintiff, J.N. and his parents, Plaintiffs, P.N. and G.N., filed this action seeking,

among other things, a review of a final decision of the New Jersey Office of Administrative Law ("OAL"), equitable relief, damages and attorneys fees and expenses. The defendants remaining in the case are Daniel Greco, co-executive director of The Windsor School; The Windsor School ("Windsor"); the Ridgewood (New Jersey) Board of education ("Ridgewood" or the "Board of Education"); and John Campion, Director/Supervisor of Special Programs, Special Education of the Board of Education.[1] Plaintiffs and the Defendants have moved for summary judgment on various counts of the Amended Complaint. For the reasons stated below, the motions will be granted in part and denied in part as detailed in the conclusion of this opinion.

### BACKGROUND

J.N. was born on June 3, 1986 and is presently nearly 17 years of age. He and his parents reside in the Ridgewood, New Jersey School District. During the 1994–1995 school year when he was eight years old J.N. was classified as eligible under the Individuals with Disabilities Education Act ("IDEA") for special education and related services, and he remained so classified throughout the period relevant to this case. J.N. is also a qualified individual with a disability as defined under § 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA").

During his kindergarten year J.N. withdrew from the public school kindergarten and began attending a special school. He continued in special schools for most of his subsequent years prior to attending Windsor.

In accordance with the IDEA, J.N. had an Individualized Education Plan ("IEP"), which is a written statement setting forth his level of educational performance, annual educational goals, educational services to be provided and his placement, if not in a regular class. *See* 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.340–30.350; N.J.A.C. 6A:14–3.7.

In September 1997 J.N. was placed in Windsor pursuant to his IEP. At the time of his placement the Board of Education's child study team described J.N. as a fragile child who was easily frustrated in a school environment and experienced extreme anxiety when asked to accomplish academic tasks. As his anxiety increased he refused to come to school. His IEP team, including P.N. and G.N., concluded that J.N. needed a school setting that would address his sensitivity to school and would provide him with a sense of structure, safety and security.

As set forth in IDEA and its regulations, what will be included in the student's IEP is to be decided at a meeting attended by a variety of participants, including: (i) the parents of the disabled child; (ii) at least one regular education teacher of the child, if the child is participating in the regular education classroom; (iii) at least one special education teacher; (iv) a representative of the district board of education; (v) at least one individual who can interpret the instructional implications of evaluation results; (vi) the student; (vii) other

---

1. Earlier in these proceedings the Amended Complaint was dismissed as against the New Jersey Department of Education, David Hespie and Vito A. Gagliardi, Sr., Commissioner of the Department of Education. Greco and Windsor had named as third party defendants Federal Insurance Company, The Chubb Company and Chubb Group of Insurance Companies. Summary Judgment was grant-ed in favor of Federal Insurance. A consent order dismissed the action against the Chubb companies without prejudice. Greco's and Windsor's motion to dismiss paragraph E of Plaintiff's prayer for injunctive relief set forth in the Amended Complaint was granted, but their motion to dismiss all of Plaintiffs' other claims for injunctive relief was denied.

experts; and (viii) when a child has been placed in a private school, a representative of the private school. *See* 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.344; N.J.A.C. 6A:14–2.3(i)(2); N.J.A.C. 6A:14–7.5(a)(1). While J.N. was enrolled at Windsor, a representative from Windsor was a member of J.N.'s IEP team.

Windsor is a private school approved by the New Jersey State Department of Education for the placement of disabled students by local school districts. When it obtained such approval Windsor executed an affidavit attesting that it would comply with IDEA, state statutes and regulations. The tuition of a substantial number of its students is paid by boards of education. When it accepted J.N. it entered into an agreement with the Board of Education. Among the terms of the 1998–1999 agreement were:

1. The SENDING DISTRICT agrees to purchase the educational services described in the pupil's individualized education program for J.N. resident pupil from the SENDING DISTRICT, from the APPROVED PRIVATE SCHOOL. The APPROVED PRIVATE SCHOOL agrees to provide the educational services described in the pupil's individual education program to J.N. in accordance with the applicable New Jersey Statutes and the rules and regulations of the State Board of Education.

2. This agreement shall be in effect for the 1998–1999 School Year. The educational services shall commence on September 3, 1998.

10. This AGREEMENT may be terminated by the SENDING DISTRICT or by the APPROVED PRIVATE SCHOOL upon 15 calendar days written notification to the other party.

14. The APPROVED PRIVATE SCHOOL as signatory to this contract agrees to operate in accordance with applicable federal and state laws, and rules and regulations including but not limited to *N.J.A.C.* 6:28–7.

J.N. began his fifth grade at Windsor pursuant to a comparable agreement in September 1997 and continued satisfactorily throughout the year with a teacher he liked. He began the next year with a new teacher with whom he did not interact as well. There occurred frequent telephone calls from J.N.'s parents to members of the Windsor staff. Windsor asserts that these telephone calls and J.N.'s frequent absences from school made it impossible to achieve the goals of J.N.'s IEP, requiring that he be terminated from Windsor for educational reasons. Plaintiffs characterize these telephone calls as the exercise of their rights under IDEA and the applicable New Jersey statutes and regulations for which J.N. was terminated in retaliation.

In any event, on December 16, 1998 Greco decided to terminate J.N.'s placement at Windsor. He promptly telephoned P.N., J.N.'s father, and advised him of this determination. At about the same time he communicated the decision by telephone to Dr. Joseph Oxhorn, the Board of Education's Child Study Team Case Manager. At that time it was decided that J.N. could continue at Windsor up to the holiday break on December 23 but that he would not return when the new semester commenced on January 4, 1999—nineteen days later.

Campion and Oxhorn, representatives of the Board of Education, met with the parents, G.N. and P.N. on December 17, 1998. They sought to preserve J.N.'s placement at Windsor. No member of the Windsor staff was present. On December 18 J.N. and his parents attended a holiday show at Windsor. The parents attempted to discuss J.N.'s termination with teachers, aides and a parent. Greco considered this to be inappropriate and decided that he

did not wish to have J.N. continue at the school. He immediately informed Campion by telephone that J.N.'s effective termination date was December 18, not January 4, 1999. On Monday, December 21 Greco informed Campion in writing that pursuant to their conference call on December 18, J.N. had been immediately terminated from Windsor.

In a letter to Campion dated December 20, 1998, the N.s requested that J.N. be given an opportunity to say good-bye to individuals at Windsor School. They also request that Dr. Greco send a letter to J.N., telling him that J.N.'s termination from Windsor did not have anything to do with J.N.'s actions. Lastly, the N.s indicated that they would be forwarding a list of expenses for reimbursements and wanted to know what Ridgewood planned to do in response to "Windsor's irrational and inhumane treatment" of their son. Campion forwarded the December 20 letter to Greco.

On December 22 Campion wrote to the N.s confirming that Oxhorn proposed for J.N. an excellent opportunity at the BCSSSD middle school in Garfield. He repeated a request that P.N. return forms authorizing him to send confidential information to BCSSSD. He concluded, "I will Fed-ex J's reports and continue the placement process throughout the holiday. With this timeline, J can be placed by the first week in January and allow an appropriate transition between vacations."

On January 4, 1999 P.N. and G.N. wrote to Campion setting forth a series of demands, including:

- Hold a Child Study team meeting with all participants from Ridgewood and Windsor. This meeting should have been convened before anyone executed any plan for termination. Ridgewood School District will arrange.
- Academic one-to-one tutoring at a site outside the home while there is an interruption in program. Transportation to/from this site to be provided. We know of a certified teacher that we would like to use. Cost of tutoring & travel to be paid by Ridgewood School District.
- Letter indicating that this termination is not J's fault from Dr. Greco, Windsor, and John Campion, Ridgewood, as soon as possible.
- Visit to Windsor for J to say good-bye and supervised by his parents or Dr. Mitnick. Any cost for Dr. Mitnick's time is to be paid for by the Ridgewood School District. Transportation costs to & from Windsor to be paid for by Ridgewood School District.

I hope that you appreciate the severity of the situation and respond expeditiously. In addition, this letter is to you and should remain in J's file. This letter may not be forwarded or copied for any individual at the Windsor School or associated with the Windsor School.

Campion responded the same day to the January 4 letter, writing, among other things:

To respond to your fax from this morning, January 4, 1999, I would like to review the activities of the last two weeks and outline our next steps to ensure J's education.

On Wednesday, December 16, 1998, you were informed by Dr. Greco, Executive Director of the Windsor School, that J's placement at Windsor School would be terminated. The termination was due to what Dr. Greco perceived as a pattern of parental interference and abuse which made it impossible to meet the needs of J's Individual Education Plan. Dr. Greco informed Dr. Oxhorn (Case Manager) of his decision, at the same time that

you were informed, and Dr. Oxhorn immediately informed me.

The Ridgewood Public Schools has been pleased with the progress J has made at Windsor School. Therefore, Dr. Oxhorn, Ms. Crawford, and I met with you on Thursday, December 17 from 2:00 to 4:30 p.m. in an attempt to mediate the situation between you and the Windsor School. Dr. Oxhorn knew that Dr. Greco expected an apology for your behavior and assurances that you would discontinue your interference in the implementation of J's program at Windsor. In fact, Dr. Oxhorn prepared a draft of a document that would verify your agreement to the necessary assurances. You took a copy of Dr. Oxhorn's draft but were unwilling to sign.

In our follow-up conversation with Dr. Greco, we were unable to provide him with the assurance that your behavior would change. At that time, Dr. Greco informed us that he would remain firm in his decision (from December 16, 1998) to terminate J from Windsor School and as of Monday, January 4, 1999, J would have to be in a new program. J would be allowed to attend Windsor School until the end of December, enabling him to participate in the holiday activities and to provide a smooth transition into his new program.

On Friday, December 18, 1998, you attended the holiday program at Windsor School. It was Dr. Greco's perception that you created a negative situation in his school and he was forced to discontinue J's program as of that day. Dr. Greco stated that your behavior affected the entire operation of his program. Dr. Oxhorn informed you of Dr. Greco's decision. On Monday, December 21, 1998, both of you visited Bergen County Special Services School District's Middle

School Program in Garfield with Dr. Oxhorn as a possible placement for J. There is space available at the program in Garfield and Dr. Oxhorn felt it would be an appropriate placement for J. On December 22, 1998 you provided the Special Programs Office with written permission to forward J's records to BCSSSD. We expect to arrange an in-take interview for J this week.

Concerning your request to review J's records. I spoke to Dr. Oxhorn this morning and he will contact you to select a mutually convenient time for a record review. He will be available to review J's file at Benjamin Franklin Middle School and the Special Programs Office. Dr. Oxhorn has arranged home instruction for J and the instructors are prepared to begin today. Dr. Oxhorn has left messages for you on your voice mail and you have his permission to call him at home. A Home Instruction IEP will be developed for J while he is on this interim program. Dr. Oxhorn will also schedule a meeting with you to review J's current IEP and make the required changes before placement in his new program.

This letter indicates that Campion sent copies of this letter not only to Board of Education personnel but also to Greco at Windsor. He did not have the N.s' authorization to do so.

On January 7, P.N. and G.N. again requested that "an immediate IEP meeting be convened" and that "[t]his meeting should be convened with the appropriate personnel, including a teacher from the Windsor School." Campion offered home instruction for J.N. while placement was pending. On January 12 P.N. and G.N. once more demanded that an IEP with Windsor and the Board of Education be

convened. The two page, single space letter expressed frustration with actions and inaction to that date and sought information whether the two teachers assigned to J.N. on an interim basis were certified. Home instruction was not instituted.

After Campion had provided P.N. and G.N. with information about several schools, on January 25, 1999 J.N. commenced placement at Chancellor Academy II in Rockaway, New Jersey. P.N. and G.N. signed a new IEP reflecting this placement on January 31, 1999. Another IEP was signed on June 14, 1999 reflecting placement at Chancellor Academy II for the 1999–2000 school year. This placement was a success, but nevertheless on several occasions P.N. and G.N. demanded an IEP meeting directly with Windsor and the Board of Education together "to discuss what, if any, concerns Windsor had which led to the termination of the placement at Windsor and to make changes in the IEP if needed to provide appropriate education."

Happily after J.N. entered Chancellor Academy II he made reasonably successful educational progress. When he started there in January 1999 he liked his teachers, he made some friends and reported that "[a]t first I was not really comfortable in going to school at all, but I got settled down after six months." As to his second year at Chancellor Academy II J.N. reported that it went "[a] lot better. I loved it the second year … I remember that I started getting along with all the teachers and everything."

J.N. completed Chancellor Academy II in December 2001 and commenced home schooling that continued until the end of the school year. Home schooling took place in the Ridgewood Public Library. J.N. reported, "I loved it. Loved it." After that his child study team, that included his parents, decided that J.N. could enter the high school.

With respect to this case and the events of December 1998 when Windsor terminated him, J.N. testified on October 21, 2002 that his parents occasionally talk to him about it but "I don't care anymore, whatever. If it happens, I don't care. I have lost interest. It was too far back. I don't care anymore. I erased it."

## STATE PROCEEDINGS

On February 1, 1999 J.N.'s parents filed a petition for a due process hearing with New Jersey Department of Education ("DOE") which was transmitted to the OAL for a hearing. The petition charged that the Board of Education and Windsor terminated J.N. in violation of IDEA and applicable New Jersey regulations, including the requirements that upon appropriate notice to the parents, an IEP meeting be convened to consider any change in a child's IEP, including change in placement, that a representative of the private school participate in IEP meetings to review and revise a child's IEP and that a child's placement be maintained during any proceeding objecting to a change of placement.

The petition also charged that following J.N.'s unlawful termination from Windsor he had been without any education services, requiring the N.s to hire someone to watch him during the day. The petition asserted that the Board of Education denied the N.s' request that instruction at some location other than their home be provided on an interim basis as well as their request for reimbursement for adult supervision of J.N. and for the fees paid to a psychiatrist to whom they took J.N. until the emotional distress caused by the wrongful termination had stabilized. Finally the N.s charged that Ridgewood sent to Windsor confidential written communications between the N.s and the Board of

Education, most particularly a letter dated January 4, 1999 from Campion to the N.s.

The petition requested the following relief:

A. Order finding that Respondents violated J.N.'s rights under IDEA by, among other things, terminating his placement without written notice and without convening an IEP meeting to discuss a change in placement and when the Ns objected, terminating the placement anyway.

B. Order directing Respondents to immediately convene an IEP meeting which will include the appropriate representatives from Ridgewood as well as J.N.'s teacher from Windsor and other appropriate personnel. The purpose of the meeting will be to discuss what if any concerns Windsor had which led Dr. Greco to terminate J.N.'s placement at Windsor and to make changes in J.N.'s IEP if needed to provide him with an appropriate education.

C. Order directing Respondents to allow J.N. to return to Windsor for up to a day to meet and say good-bye to his classmates and to the many Windsor professional staff who have worked with J.N. J.N.'s parents and one other person will be allowed to accompany him during this visit.

D. Order directing The Windsor School and John Campion from Ridgewood School to write letters to J.N. explaining that his leaving The Windsor School had nothing to do with him, his performance or behavior.

E. Order directing one or both Respondents to reimburse the Ns for J.N.'s therapy sessions with Dr. David Mitnick.

F. Order directing Respondents to remove any derogatory or defamatory references to the Ns concerning their involvement while J.N. was attending Windsor, in particular Dr. Greco's December 21, 1998 letter to Campion and Campion's January 4, 1999 letter to the Ns, from J.N.'s files and directing Ridgewood and Windsor to destroy any other copies of these documents in existence.

G. Order directing Ridgewood to provide J.N. with one-on-one instruction at a location other than his home until an appropriate placement is obtained and J.N. begins attending there and to provide compensatory education for J.N. for lost educational days.

H. Order directing one or both Respondents to reimburse the Ns for the cost of adult supervision for J.N. during the school day which the Ns had to provide because of the unlawful termination of J.N.'s placement at The Windsor School.

The petition was decided on cross motions for summary decisions and joint stipulations of facts, that included relevant documents as Exhibits A–BB. Administrative Law Judge the Honorable Mumtaz Bari–Brown ("ALJ"), issued a decision on June 3, 1999. The ALJ found the facts to be generally as recited above and in particular that "Windsor did not abide by the fifteen days notification requirement." She concluded that summary disposition was appropriate.

In her discussion of the question whether the OAL had jurisdiction over Windsor, the ALJ observed that "[h]ad petitioner requested due process and invoked the 'stay-put' provision, J.N. could have remained at Windsor pending the resolution of the due process hearings. N.J.A.C. 6A:14–7.6(b)." The ALJ then concluded that "the OAL does not have jurisdiction over a private school in a due process hearing.", citing *H.F. v. Pemberton Twp. Bd. Of Ed.*, 97 N.J.A.R. 2nd (EDS) 101,

and therefore no relief against Windsor was available in the due process proceeding.

The ALJ noted that Windsor was obligated to provide 15 days written notice to the Board of Education of its intent to terminate J.N.'s program and that upon receipt of such notice the Board of Education "was obligated to have convened 'an IEP meeting according to N.J.A.C. 6A:14–2.3(i)(2) . . . without delay and shall include the participation of the appropriate personnel from the receiving school.' N.J.A.C. 6A:14–7.7(a)." The ALJ also noted that Windsor failed to give the 15 days written notice to the Board of Education, advising them orally instead on December 16, 1998. In consequence, as the ALJ put it, "[i]mmediately thereafter, Ridgewood and Petitioners met and attempted to resolve the problems. When the issue could not be resolved, Petitioners agreed to discuss and exchanged correspondence regarding J.N.'s new placement." This resulted in J.N.'s enrollment in Chancellor Academy II within 17 days after termination of his placement at Windsor. These facts, the ALJ held, did not justify compensatory education. The ALJ granted Windsor's and the Board of Education's motions for summary decision and denied the N.s' motion for summary decision.

At about the time the N.s filed their petition for due process they filed a request for a complaint investigation with the DOE's Office of Special Education Programs ("OSEP"). The issues raised in the complaint investigation were similar to those contained in the due process petition.

The OSEP issued a Complaint Investigation Report on November 29, 1999. The Report noted the decision of the ALJ and stated that "[b]ecause federal regulations indicate that hearing decisions are binding, this investigation cannot overturn the ALJ's decision." However, the Report's author obviously disagreed with the conclusions of the ALJ, a disagreement reflected in the corrective actions imposed upon Windsor and the Board of Education.

As to the question of J.N.'s termination the Report stated that " . . . this investigation did determine that the district and the private school failed to follow an appropriate process for terminating this student's educational program . . ." The corrective action required was:

The private school must develop a corrective action plan which identifies the procedure it will follow to ensure that upon consideration of termination of an educationally disabled pupil, the private school will notify the district who in turn will convene an appropriately configured team, review and revise the IEP, and provide notice of any proposed changes.

As to the question whether the Board of Education improperly provided a permitted pupil record to Windsor without the N.s' consent, the Report stated that " . . . the director of special services did, in fact, forward the letter (from the Ns to Campion), a permitted pupil record, to the chief school administrator without obtaining the consent of the complainants." The corrective action required was:

The district is directed to develop a corrective action plan which identifies the procedure it will follow to ensure that parental consent is obtained prior to sending permitted pupil records to out-of-district personnel.

Plaintiffs filed this action to review the decision of the ALJ pursuant to 20 U.S.C. § 1415. The Amended Complaint also asserts claims under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a); the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; the American with Disabilities Act ("ADA"), 42 U.S.C. § 12132, § 12182, and § 12203; the Civil Rights Acts of 1866 and 1871, 42 U.S.C. § 1983;

the Federal and New Jersey Constitutions; New Jersey's Special Education Law, N.J.S.A. 18A:46–1, *et seq.;* and for breach of contract.

### DISCUSSION

Because the operative Amended Complaint sweeps several Defendants and/or asserted sources of liability into most of its counts, it would be cumbersome and confusing to discuss the various motions for summary judgment count by count. Instead, the following discussion is largely organized by source of liability, and a concluding summary is provided of the implications for each claim in each count of the Amended Complaint.

In connection with the present motions, the parties have raised a number of evidentiary issues, contending that several items of evidence are not cognizable in support of or in opposition to a motion for summary judgment. In large part because most of the essential facts of the case are not disputed, there is no need to decide these evidentiary issues: the disposition of the various motions does not depend on the resolution of the evidentiary disputes.

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The evidence need not be in a form that would be admissible at

trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. But Rule 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge."

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, a plaintiff may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).

### I. Claims under the IDEA Arising from the Change in J.N.'s Placement

#### A. The Legislative and Regulatory Framework

IDEA was enacted to provide disabled children a free appropriate education ("FAPE"). It is implemented by federal and state regulations. IDEA provides that each state educational agency, state

agency or local agency that receives assistance under IDEA "shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies." 20 U.S.C. § 1415(a).

The centerpiece of IDEA is the Individualized Education Plan ("IEP") which is a written program statement for each child with a disability, including, among other things, a child's placement. 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.340–300.350; N.J.A.C. 6A:14–3.7. IDEA establishes comprehensive procedures for preparing and changing an IEP. Changes must be made at a duly noticed IEP meeting attended by the parents of the disabled child, a representative of the board of education, and, if the child has been placed in a private school, a representative of the private school. 20 U.S.C. § 1414(d)(1)(B) & (f) and § 1415(b)(1) & (3); 34 C.F.R. §§ 300.344, 300.345(a); N.J.A.C. 6A:14–2.3(i)(2); N.J.A.C. 6A:14–7.5(a)(1).

New Jersey's special education regulations are intended to fulfill the state's responsibilities under IDEA. N.J.A.C. 6A:14–1.1(b)(1),(4). Under these regulations a student may request a due process hearing when "there is disagreement regarding identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action . . . ." N.J.A.C. 6A:14–2.7. The Department of Education, Office of Special Education Programs, has been designated as the agency responsible for handling due process petitions and OAL has been designated to conduct the evidentiary hearing and issue a final decision. N.J.A.C. 6A:14–2.7(a), (c), (d).

New Jersey's special education regulations provide that they "shall apply to all public and private agencies providing publicly funded educational programs and services to students with disabilities." N.J.A.C. 6A:14–1.1(c). In order to become an approved private school for the provision of special education, a private school must submit an affidavit attesting it will comply with IDEA, state statutes and regulations, § 504 and the ADA. N.J.A.C. 6A:14–7.2(a)(4). Further, an approved private school that accepts a disabled student placed there by a school district must enter into a contract with the school district, provided by the State, in which the private school agrees to provide the student educational services as described in the child's IEP "in accordance with the applicable New Jersey Statutes and rules and regulations of the State Board of Education" and agrees to operate "in accordance with applicable federal and state laws, and rules and regulations including but not limited to N.J.A.C. 6:28–7."

New Jersey's regulations detail what must happen if a private school seeks to terminate the placement of a student, whether for disciplinary or other reasons. N.J.A.C. 6A:14–7.6(d) and 7.7:

(a) When a receiving school is considering the termination of a student's placement prior to the end of the student's academic year, the receiving school shall immediately contact the district board of education. The district board of education shall convene an IEP meeting according to N.J.A.C. 6A:14–2.3(i)2. Such meeting shall occur without delay and shall include the participation of appropriate personnel from the receiving school.

N.J.A.C. 6A:14–7.7. Further, the regulations provide that "[s]uch termination shall be in accordance with the provisions of the contract between the receiving school and the district board of education." N.J.A.C. 6A:14–7.7(a)(1).

IDEA provides parents must be given written notice of an IEP meeting to consider change of placement. 20 U.S.C. §§ 1415(b)(3)(A), (B); 34 C.F.R. § 300.503(a); N.J.A.C. 6A:14–2.3(i); N.J.A.C. 6A:14–2.3(d)(1); N.J.A.C. 6A:14–2.3(h). After an IEP meeting has been held, if the IEP team decides to make a change in the child's IEP, including changing the child's placement, written notice must be provided to the parents no later than 15 days after the determination and at least 15 calendar days prior to the implementation of the proposed change in placement so that the parents may consider the proposal. N.J.A.C. 6A:14–2.3(f)(2). Written notice must include specific items setting out exactly what changes are being proposed, the reason for the changes and a description of other options considered and the reasons why these options were rejected. 20 U.S.C. § 1415(c); 34 C.F.R. § 300.503(b); N.J.A.C. 6A:14–2.3(d).

One reason for the notice periods in the case of a change of placement, is to enable the parents to take advantage of IDEA's stay-put provision contained in the section of IDEA governing procedural safeguards and due process hearings:

> Except as provided in subsection (k)(7) of this section [inapplicable in the present case], during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).

IDEA provides that disabled students and their parents have a right to confidentiality. 20 U.S.C. § 1412(a)(8) and § 1417(c); 34 C.F.R. 300.560–577. With certain exceptions, personally identifiable information cannot be disclosed without the consent of the child's parents. 34 C.F.R. 300.571; N.J.A.C. 6A:14–2.9; N.J.A.C. 6:3–6.1, *et seq.*

### B. Review of the OAL Decision

The ALJ rejected Plaintiffs' claims against Windsor because she concluded that the OAL did not have jurisdiction over Windsor as a private school. She also determined that J.N. was not entitled to compensatory education for the 17 days of instruction he missed. The ALJ reasoned that compensatory education was unavailable under the relevant standard because Ridgewood made reasonable efforts to obtain a new placement for J.N. and in fact found a new placement for him within 17 days. She also concluded that none of the other relief requested by the N.s was appropriate, observing that it had "nothing to do with the provision of a FAPE." (She specifically referred only to the N.s' request that Windsor and Ridgewood write letters to J.N.). Count One of the Amended Complaint calls for a determination that the ALJ's decision was erroneous. Plaintiffs and all Defendants move for summary judgment on this count.

In reviewing administrative decisions in IDEA cases, a district court applies a de novo standard to questions of law. *L.M. ex rel. H.M. v. Evesham Tp. Bd. of Educ.*, 256 F.Supp.2d 290, 294–95 (D.N.J.2003) (citing *Carlisle Area School v. Scott P.*, 62 F.3d 520, 528 (3d Cir.1995)). Administrative findings of fact are subject to a modified de novo standard of review as described by the Court of Appeals in *S.H. v. State–Operated School Dist. of City of Newark*, 336 F.3d 260 (3d Cir.2003). The ALJ made her determination as a matter of law on stipulated facts; accordingly, review of her decision is plenary.

■ The ALJ erred when she concluded that she did not have jurisdiction over the N.s' claims against Windsor. As the discussion below of Windsor's liability under the IDEA reveals, Windsor, its status as a private school notwithstanding, is subject to IDEA and the regulations promulgated to implement it. It would be anomalous for Windsor not to be subject to the administrative procedures provided to ensure that IDEA requirements are fulfilled; and there are in fact instances in which private schools have been treated as within the jurisdiction of the OAL. *See, e.g., B.H. v. Paterson School Dist.,* 2000 WL 266416 (N.J. Adm. Feb.04, 2000) (NO. EDS 1345–00). Windsor concedes that it is subject to the jurisdiction of the OAL for the limited purpose of the stay-put provision, but contends that it is nevertheless beyond OAL jurisdiction in other respects. But as Plaintiffs observe, it is improbable that a private school could be subject to OAL jurisdiction for the purposes of the stay-put provision but not with respect to other aspects of the administrative proceedings.

■ The ALJ also erred in determining as a matter of law that the N.s were not entitled to compensatory education as a remedy for the 17 days of schooling that J.N. missed as a result of the abrupt termination of his placement at Windsor. Referring to the standard set forth in *M.C. on Behalf of J.C. v. Central Regional School Dist.,* 81 F.3d 389, 395–97 (3d Cir. 1996),[2] the ALJ concluded as a matter of law that Ridgewood had taken no more than a reasonable time to remedy the problems caused by Windsor's decision to terminate J.N.'s placement and that compensatory education was therefore not appropriate. The ALJ's application of the *M.C.* standard was erroneous, however, because it failed to take into account Ridgewood's ultimate responsibility for Windsor's termination of the placement, and because it failed to take into account the difference between revising a deficient IEP (as in *M.C.*) and preventing (or immediately remedying) a complete cessation of schooling for the disabled student. Where, as in this case, a child is simply deprived of educational services by the improper termination of his placement, and where the deprivation could simply be remedied by a resumption of that placement, it is not reasonable for him to be without instruction for any length of time.

■ The N.s also challenge the ALJ's determination that other relief they sought was beyond her authority to provide. Her opinion suggests the view that she could only afford relief that went directly to the provision of a FAPE. Even if the ALJ's view of her own authority is correct, it would be erroneous to suggest that the relief sought by the N.s is categorically unavailable in this court. To the extent that the ALJ's view purports to represent a generally applicable description of the relief available under the IDEA, it is erroneous. The Court of Appeals has made it clear that the IDEA can provide the basis for a full range of relief. *See W.B. v. Matula,* 67 F.3d at 494–95.

### C. Windsor's Liability under the IDEA

■ Because it is beyond any reasonable dispute that the termination of J.N.'s placement at Windsor was not effected in

---

2. The Court of Appeals summarized that standard as follows:

[A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a de minimis educational benefit must correct the situation. If it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.

*Id.* at 397.

the manner prescribed by the IDEA and the implementing regulations, Windsor is liable under the statute.[3] The N.s and Ridgewood were first advised of Windsor's decision to terminate the placement on December 16, 1998; and the termination was ultimately made effective only two days later—providing notice far shorter than the absolute minimum of 15 days that would properly have to elapse before a change in placement could be effective under the applicable regulations. N.J.A.C. 6A:14–2.3(f)(2). Windsor contends that any violation of the regulations on its part was merely "technical"; and it suggests that events would have played out no differently if proper notice had been provided. But these arguments are without merit. First, The Supreme Court has made it clear that the procedural rights provided by the IDEA—parents' rights to participation in decisions relating to their children's education—are as important as substantive rights. *Board of Education v. Rowley,* 458 U.S. 176, 205–206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Because Windsor's actions operated to deprive the N.s of procedural rights under the IDEA, they cannot be dismissed as merely technical violations of the Act. Second, Windsor's contention that the outcome would have been no different even if it had abided by the letter of the regulations (and the agreement with Ridgewood), is entirely speculative. It is impossible to say with certainty what result might have been achieved if proper notice had been given. A timely IEP meeting might have been convened; the N.s would have had the opportunity to bring their case to the OAL and invoke the stay-put provision before J.N.'s termination became effective; and there is at least some probability that J.N. would not have missed the days of schooling that

he did miss as a result of the excessively hasty termination.

Because the termination of J.N.'s placement at Windsor failed to conform to the requirements of the IDEA and the related state regulations, Windsor may escape liability under the IDEA only if it is not subject to IDEA rules. Windsor contends that public education authorities are solely responsible for guaranteeing the rights of students and parents under the IDEA and that therefore, as a private school, it has no obligations under the IDEA. But its argument is unavailing.

As a private school accepting placements of students protected by the IDEA, Windsor is subject to IDEA regulations, and it can therefore be held liable under the IDEA for its failure to comply with IDEA rules in connection with the termination of J.N.'s placement. New Jersey regulations implementing the IDEA are expressly made applicable to private entities providing publicly funded educational programs and services to students with disabilities. *See* N.J.A.C. 6A:14–1.1(c). In *Geis v. Board of Education of Parsippany–Troy Hills,* 774 F.2d 575, 578–81 (3d Cir.1985) the Court of Appeals held that New Jersey's special education regulations implement the IDEA's mandates and that the IDEA incorporates the requirements established by state law. Accordingly, if the state regulations reach a private school in Windsor's position, which they appear to do, then Windsor is subject to liability for violations of the IDEA. Windsor and Greco cite *St. Johnsbury Academy v. D.H.,* 240 F.3d 163 (2d Cir.2001), in which the Second Circuit held that the IDEA applies only to the state and other public agencies, not to private schools in which public agen-

---

**3.** In addition to claims that the manner of J.N.'s termination violated the IDEA, the Amended Complaint includes claims that Defendants actions constituted retaliation for the exercise of rights protected by the IDEA. However, because the IDEA contains no retaliation provision, Plaintiffs can have no viable distinct retaliation claim under the IDEA.

cies may place children. But an important feature of the reasoning in *St. Johnsbury* is apparently not present in this case: in *St. Johnsbury* the court emphasized that Vermont regulations regarding due process hearings provided for actions only against public entities. The corresponding New Jersey regulation does not by its terms preclude actions against private entities. *See* N.J.A.C. 6A:14–2.7.[4] In addition, it appears that *St. Johnsbury* may have inferred too much from the (entirely sound) proposition that public educational authorities cannot divest themselves of their responsibilities under the IDEA by placing children with disabilities in private schools. The fact that, even in the case of private school placement, "responsibility for compliance with IDEA remains with the public agency," *St. Johnsbury*, 240 F.3d at 171, does not imply that the no responsibility falls upon the private school: it is not by any means illogical for both the public authority (which has the initial and ultimate obligation to educate the child) and the private school (which is actually entrusted with the task and given the requisite funds) to be subject to IDEA rules.

#### D. Greco's Liability under the IDEA

■ Although the IDEA thus does impose obligations on Windsor, it does not by its own terms extend to Greco. Accordingly, even though J.N.'s improper termination was apparently effected on Greco's authority, he is not liable under the IDEA. The IDEA's requirements are imposed in the first instance on public educational authorities, and extended by regulation to private entities accepting placements of students covered by the IDEA. But no provision of the IDEA or

implementing regulations extends its obligations to individual actors, and Greco is accordingly not subject to individual liability under the IDEA. In some cases plaintiffs have invoked 42 U.S.C. § 1983 in order to impose liability on individuals for violations of rights under the IDEA. *See, e.g., W.B. v. Matula,* 67 F.3d 484 (3d Cir. 1995). But § 1983 is not available against Greco, or for that matter against Windsor, because they are not state actors for the purposes of the law: the Court of Appeals' discussion and application of the relevant standards in *Robert S. v. Stetson School, Inc.,* 256 F.3d 159 (3d Cir.2001), makes it clear that a school performing the functions that Windsor performed with respect to J.N. does not act under color of state law for the purposes of § 1983.[5] It is self-evident that Greco cannot have been acting under color of state law if Windsor was not; accordingly, § 1983 does not operate to impose liability on Greco.

#### E. Ridgewood's Liability under the IDEA

■ Ridgewood is quite clearly liable to Plaintiffs under the IDEA. As already noted above, state and local educational authorities are ultimately responsible for ensuring that a student's rights under the IDEA are protected, and they cannot divest themselves of that responsibility by placing a child in a private school. By failing to ensure that Windsor complied with the applicable regulations in terminating J.N.'s placement and by failing to convene a timely IEP meeting, Ridgewood violated the IDEA. Ridgewood argues, with some justification, that Windsor was the driving force behind any violation of

---

4. Further, the description of the Vermont regulatory scheme in *St. Johnsbury* contains no reference to a provision such as N.J.A.C. 6A:14–1.1(c) expressly rendering IDEA regulations applicable to private entities taking placements of disabled students.

5. Plaintiffs argue that Windsor admitted in pleadings to acting under color of state law. However, such an admission is not controlling on a legal conclusion of this kind.

the IDEA; and it does not appear that Ridgewood or Defendant Campion acted in bad faith. Indeed, they seem to have made genuine, and ultimately successful, efforts to find a new placement for J.N. and mitigate any ill effects from the termination. But the fact remains that Ridgewood had a non-delegable obligation to ensure that the N.s' rights under the IDEA were not infringed; and in addition, Ridgewood is liable on its own account for failure to convene a proper IEP without delay once it became aware of Windsor's plan to terminate the placement.[6] (Because, as a public entity, Ridgewood was of course acting under color of state law, it is also liable under § 1983 for violating Plaintiffs' rights under the IDEA by its failure to abide by IDEA procedures for formulating a new IEP.)[7]

### F. Campion's Liability under the IDEA

■ Although, as discussed above with regard to Greco, the IDEA does not in itself provide for individual liability, it does appear that individuals may be held liable under § 1983 for violations of the IDEA. *See W.B. v. Matula,* 67 F.3d 484. Accordingly, Campion is not categorically immune from liability for violations of the IDEA.

Campion contends, however, that he was not responsible for any violation of IDEA requirements in connection with J.N.'s removal from Windsor. Campion asserts that it was not his responsibility to call an IEP meeting (and that his December 17 meeting with the N.'s was the equivalent of an IEP meeting); and he contends that he had no control over Windsor's unilateral decision to terminate J.N.'s placement. If Campion were not a personal participant in the asserted violations, he could not be liable under § 1983. "In order to render [defendant] personally liable under section 1983, the [plaintiffs] must show that he participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge ... had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.,* 50 F.3d 1186, 1190–91 (3d Cir.1995). It is apparent from the record that Campion was the N.s' main contact at Ridgewood, and a point of contact between Ridgewood and Windsor as well; and it is evident that he was directly and extensively involved in J.N.'s case. Whatever his habitual role within Ridgewood, it is apparent that he was the principal figure attending to J.N.'s placement, and that he at least knew of and acquiesced in violations of IDEA procedures. He was therefore a personal participant in violations of the N.s' rights under the IDEA and § 1983.

**6.** Ridgewood's contention that the December 17, 1998 meeting was the equivalent of an IEP meeting is without merit—if for no other reason, because it did not include all the required participants under the regulations. Ridgewood and Campion do raise genuine issues of fact with respect to other asserted IDEA violations, including the alleged failure to make interim education available while a new placement was sought for J.N.; but the failure to abide by IDEA procedures for formulating a new IEP is sufficient to render Ridgewood liable under the IDEA.

**7.** In an argument addressing only one portion of the relief sought by Plaintiffs, Ridgewood contends that it cannot be liable for damages relating to the provision of psychiatric care to J.N. Ridgewood asserts that these damages are unavailable because psychiatric care is not a service related to the provision of a FAPE for the purposes of the IDEA. However, even granting Ridgewood's premise that it would not have been obliged to provide the care at issue as related to a FAPE, it may still be liable for damages arising from care that J.N. required as a result of IDEA violations. As *W.B. v. Matula* indicates, the broad range of relief available under § 1983 for violations of the IDEA is not limited to services that might have originally been within the scope of a FAPE. 67 F.3d at 494–95.

Campion also argues that he is protected from any liability by the doctrine of qualified immunity. Qualified immunity grants government officials performing discretionary functions immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The facts here do not support a defense of qualified immunity: the relevant statutes and regulations on the requisite procedures for the termination of J.N.'s placement are both clear and specific.

## II. Contract Claims

■■■■ In addition to the claims they assert directly under the IDEA or under the IDEA in conjunction with § 1983, Plaintiffs also assert claims as third party beneficiaries of the contract between Windsor and Ridgewood, pursuant to which Windsor agreed to abide by applicable federal and state regulations in connection with J.N.'s placement.[8] Windsor's violation of the applicable regulations under the IDEA also constituted a breach of its contract with Ridgewood. By its terms that contract was entered into specifically for the benefit of J.N., and summary judgment is accordingly appropriate in Plaintiffs' favor on their third party beneficiary claims against Windsor. A third party may bring suit under a contract where the contract is " 'made for the benefit of [that] party within the intent and contemplation of the contracting parties.' " *Grant v. Coca-Cola Bottling Co.,* 780 F.Supp. 246, 248–49 (D.N.J.1991) (quoting *First Nat'l State Bank of New Jersey v. Commonwealth Fed'l Sav. and Loan Assoc.,* 610 F.2d 164, 170 (3d Cir.1979)). Windsor contends that because any breach of the contract on its part was assertedly not material, it is not liable for breach on a third-party beneficiary theory. But as Plaintiffs note, the materiality of a breach, though it is relevant to the non-breaching party's continuing obligation to perform, has no effect on the right of a non-breaching party, or a third party beneficiary, to bring suit under the contract. *See Restatement (Second) of Contracts* § 237 (1981); *General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 315 (3d Cir.2001). Accordingly, Windsor is liable to Plaintiffs on their third party beneficiary claim. (Plaintiffs' third party beneficiary status can of course be a basis for liability only with respect to Windsor—as only Windsor, not Greco, was a party to the contract with Ridgewood.)

## III. Claims under § 504

### A. Discrimination

■■■ Section 504 of the Rehabilitation Act provides,

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

8. The third-party beneficiary claims appear most clearly in Count Four of the Amended Complaint. In Count Thirteen, Plaintiffs assert claims under state regulations and invoke Windsor's undertaking, as a provider of special education, to abide by those regulations. Windsor reads that claim as a different third party beneficiary claim and challenges it as such, contending that Windsor's agreement to abide by state regulations as a condition of its status did not confer third party rights on Plaintiffs. Plaintiffs appear to concede that point, and contend that Count Thirteen should be read not as a contract claim but rather as a claim under the state regulations. In that form it substantially duplicates their claims under the IDEA, discussed above, and the same analysis applies. Because Count Thirteen contains viable claims only to the extent that it duplicates claims asserted in other counts, summary judgment in favor of Defendants is appropriate on this count.

discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794.

Relevant regulations promulgated to implement § 504 requirements provide,

> (a) Preplacement evaluation. A recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

34 C.F.R. § 104.35. *See also,* 34 C.F.R. § 104.39.

The Court of Appeals has observed that the requirements imposed under § 504 substantially duplicate those provided under the IDEA. *See W.B. v. Matula,* 67 F.3d at 492–93 (noting that there are "few differences, if any" between the requirements imposed by the two provisions).[9] Accordingly, both Windsor and Ridgewood are liable under § 504 on the same theories that render them liable under the IDEA. Also for the same reasons addressed above, Ridgewood, but not Windsor, may also be held liable under § 1983 for violations of § 504.

There is no merit to Windsor's position that it is not a recipient of federal funds for the purposes of § 504. The relevant regulation defining a recipient for the purposes of § 504 provides,

> (i) Recipient means any State or political subdivision thereof, or any instrumentality of a State or political subdivi-

sion thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. § 106.2. There can be little doubt that Windsor is a recipient of federal funds for the purposes of § 504: the fact that it receives federal funds indirectly as a result of placements by Ridgewood and other public authorities is of no moment. *Cf. Grove City College v. Bell,* 465 U.S. 555, 564–69, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

The case law indicates that individuals may not be held liable under § 504 alone. *See Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000). However it appears that individuals may be held liable under § 1983 for infringements of rights under § 504. *See, e.g., W.B. v. Matula,* 67 F.3d 484. Accordingly, for the same reasons considered above in connection with § 1983 liability for IDEA violations, Campion, but not Greco, may be liable under § 1983 for violations of § 504.

**B. Retaliation**

 In addition to claiming that J.N.'s termination violated the anti-discrimination prohibitions of § 504 and relevant regulations, Plaintiffs claim that Defendants violated the antiretaliation regulations under § 504. They invoke 34 C.F.R. § 100.7, which provides,

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege

---

**9.** *Discriminatory intent is not an element of a claim under § 504. W.B. v. Matula,* 67 F.3d at 492.

secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7. The elements of a retaliation claim under § 504 (and, as discussed below, under the ADA) are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir.2002).

 Plaintiffs have presented sufficient evidence to survive the motions for summary judgment on their § 504 retaliation claims. It is apparent from the record that the N.s engaged in protected activity for the purposes of § 504, including advocacy for J.N. and other similarly situated students, along with requests (directed at both Ridgewood and Windsor) for accommodations of J.N.'s disability, *see, e.g., Weixel*, 287 F.3d at 149 (noting that a request for a reasonable accommodation can be protected activity for the purposes of a retaliation claim under either § 504 or the ADA). It is also apparent that Defendants were aware of the protected activity. There is also evidence in the record that adverse action was taken against the N.s (including the accelerated termination of the Windsor placement; the delay in scheduling an IEP meeting; and, according to Plaintiffs, the failure to provide adequate interim education for J.N.[10]). It is apparent that Defendants were aware of the N.s' protected activity, and there is sufficient support in the record for the inference of a causal connection between the adverse actions and the protected ac-

tivity. The record suggests a history of antagonism between the N.s and officials at both Ridgewood and Windsor; and whether the antagonism resulted from disruptiveness on the part of the N.s or from their protected activity is a question of fact.

It is evident from the language of the relevant regulation that individual actors can be liable for retaliation under § 504. 34 C.F.R. § 100.7. provides that no recipient "or other person" may engage in retaliatory activity. Accordingly, Defendants Greco and Campion may be held liable for retaliation under § 504.

Plaintiffs also assert claims for retaliation under § 1983 for a violation of § 504. For reasons discussed above with respect to § 1983 liability, these claims are viable against Ridgewood and against Campion.

### IV. Claims under the ADA

Plaintiffs claim that all the remaining Defendants are liable under the anti-retaliation provision of the ADA, both by itself and in conjunction with § 1983; and their claims are viable against Windsor (under the ADA alone), against Ridgewood (under the ADA and under § 1983) and against Campion (under § 1983). Because the ADA does not by itself provide for individual liability, and because Greco is not a state actor for the purposes of § 1983, Plaintiffs' ADA retaliation claims against Greco cannot survive summary judgment.

The anti-retaliation provision of the ADA states,

(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted,

---

10. The N.s contend that the interim home instruction offered to them was not to be provided by teachers certified in special education, as required by applicable regulations.

or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

(c) Remedies and procedures

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

42 U.S.C. § 12203.

 As noted above, the elements of a cause of action for retaliation under the ADA are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel*, 287 F.3d at 148. These are the identical elements for liability under the antiretaliation provision of § 504; accordingly, for the same reasons discussed above with respect to that provision, Plaintiffs' claim of retaliation under the ADA against Windsor and Ridgewood must survive the motions for summary judgment. (Ridgewood may also be liable under § 1983 for an ADA violation.)

 Plaintiffs' ADA retaliation claim against Greco is not viable because the ADA does not by itself provide for individual liability for retaliation. *See Douris v.* *Schweiker*, 229 F.Supp.2d 391, 396–97 (E.D.Pa.2002), and because Greco was not a state actor for the purposes of § 1983, Plaintiffs may not avail themselves of § 1983 to bring a claim against Greco for any violation of rights under the ADA.

 Campion's situation is different. Because he is a state actor for the purposes of § 1983, Plaintiffs' may bring § 1983 claims against him for violations of their right against retaliation under the ADA. A reasonable argument can be made that ADA violations should not be actionable under § 1983 because the ADA provides comprehensive remedies that indicate a congressional intent to preclude resort to § 1983. But the case law clearly disfavors such an argument for a defendant in Campion's position, and Plaintiffs may accordingly assert a retaliation claim against him under § 1983 and the ADA. Section 1983 is "presumptively available remedy for claimed violations of federal law." *Livadas v. Bradshaw*, 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). In certain instances Congress may indicate that a statutory violation will not give rise to a § 1983 claim, either expressly or by providing a comprehensive enforcement scheme specific to the statute. *Id.* But no such Congressional intent is evident here.

 The anti-retaliation provision of the ADA provides that the statutory remedies available for retaliation shall be the same as those available under the appropriate portion of the ADA for the discrimination addressed by the protected activity. Discrimination by Ridgewood would be actionable under Title II of the ADA, 42 U.S.C. § 12132, with remedies provided by 42 U.S.C. § 12133. Section 12133 "adopts the remedies, procedures and rights set forth in section 794a of Title 29, which contains the remedies for violations of Section 504." *Kevin M. v. Bristol Township School Dist.*, Civ. A. No. 00–6030, 2002 WL

73233, at \*9 (E.D.Pa. Jan.16, 2002). Section 794a in turn provides that the remedies for violations of § 504 shall be those available for violations of Title VI of the Civil Rights Act, and the Court of Appeals has made it clear that in a case such as this involving special education, "the remedies, procedures and rights under Title VI apply to ... ADA and Section 504 claims." *Id.* at \*9 (citing *Jeremy H. v. Mount Lebanon Sch. Dist.,* 95 F.3d 272, 282 n. 17. (3d Cir.1996)). The Court of Appeals has held that the Title VI remedial scheme is not sufficiently comprehensive to foreclose resort to Section 1983. *Kevin M.,* 2002 WL 73233, at \*10 (citing *Powell v. Ridge,* 189 F.3d 387, 402 (3d Cir.1999)) (implied overruling on other grounds recognized by *South Camden Citizens in Action,* 274 F.3d 771, 777–778 (3rd Cir.2001)); citing *Jeremy H.,* 95 F.3d at 278 n. 13, as illustrating the proposition that the IDEA, "which provides for a more comprehensive remedial scheme than the ADA and Section 504, does not foreclose suit under Section 1983"); and citing *Frederick L. v. Dept. of Pub. Welfare,* 157 F.Supp.2d 509, 533–534 (E.D.Pa.2001)); *cf. W.B. v. Matula,* 67 F.3d at 494 (referring to the availability of a " § 1983 claim predicated on § 504"). Accordingly, the remedies available for ADA retaliation by Ridgewood or Campion are not so extensive as to prevent Plaintiffs from asserting claims against Campion under § 1983 for ADA violations. Summary judgment is not appropriate as to such claims.

## V. Claims against Ridgewood and Campion Arising from the Disclosure of Records and the Inclusion in Records of Assertions not Based on Personal Knowledge

### A. Disclosure of Confidential Records

 In Count Twelve of the complaint, Plaintiffs assert that Defendants Campion and Ridgewood violated their rights under IDEA and FERPA and as enforced through 42 U.S.C. § 1983 by forwarding to the Windsor School a December 20, 1998 letter the N.s wrote to Campion and a January 4, 1999 letter Campion wrote to the N.s. For the reasons set forth below, summary judgment in favor of Plaintiffs and against Ridgewood and Campion is appropriate as to liability under the IDEA and § 1983 with respect to both letters; summary judgment in Defendants' favor is appropriate for claims asserted under FERPA.

In the December 20, 1998 letter from the N.s to Defendant Campion, the N.s requested that J.N. be given an opportunity to say good-bye to individuals at Windsor School. They also requested that Dr. Greco send a letter to J.N., telling him that J.N.'s termination from Windsor did not have anything to do with J.N.'s actions. Lastly, the N.s indicated that they would be forwarding a list of expenses for reimbursements and wanted to know what Ridgewood planned to do in response to "Windsor's irrational and inhumane treatment" of their son.

In the January 4, 1999 letter from Defendant Campion to the N.s, Defendant Campion reviewed the activities of the prior two weeks and outlined a plan to ensure J.N.'s future education. This letter was forwarded to Dr. Greco and four other individuals.

Under the New Jersey Administrative Code, these letters are considered part of J.N.'s "permitted pupil record." N.J.A.C. 6:3–6:3(a)(2) ("Permitted pupil records are those which a district board of education has authorized by resolution adopted at a regular public meeting to be collected in order to promote the educational welfare of the pupil."). Under Ridgewood's own policies and procedures regarding pupil records, correspondence to or from par-

ents is included in the definition of permitted pupil record.

Under the IDEA, disabled students and their parents are entitled to the confidentiality of any personally identifiable data, information, and records collected or maintained by state and local education agencies. 20 U.S.C. §§ 1412(a)(8), 1417(c); 34 C.F.R. 300.560–577. With certain exceptions, such information cannot be disclosed without the consent of the child's parents. 34 C.F.R. 300.571; N.J.A.C. 6A:14–2.9; N.J.A.C. 6:3–6.1 *et seq.*

Congress enacted The Family Education and Privacy Rights Act (FERPA) under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records. *Gonzaga University v. Doe,* 536 U.S. 273, 278, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). FERPA provides that

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ... ) of students without the written consent of their parents to any individual, agency, or organization.

20 U.S.C. § 1232g(b)(1).

A claim based on a statutory violation is enforceable under § 1983 only where the statute creates "rights, privileges, or immunities" in the particular plaintiff. *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 107–108, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531,

67 L.Ed.2d 694 (1981). In *Gonzaga,* the Supreme Court held that FERPA's non-disclosure provisions fail to confer enforceable rights. 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309. FERPA's provisions speak only to the Secretary of Education, directing that "no funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." *Id.* at 287, 122 S.Ct. 2268 (citing 20 U.S.C. § 1232g(b)(1)). This language entirely lacks the "sort of rights-creating language" critical to showing the requisite congressional intent to create new rights. *Id.* (citing *Alexander v. Sandoval,* 532 U.S. 275, 288–89, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Cannon v. University of Chicago,* 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1946)). Thus, summary judgment in Defendants' favor is appropriate as to the FERPA claims contained in Count Twelve of the Amended Complaint.

 The claims under § 1983 for violations of the confidentiality requirements of the IDEA are, however entirely viable, and summary judgment in Plaintiffs' favor is appropriate on those claims with respect to both Ridgewood and Campion. Under the relevant statutes and regulations and under Ridgewood's own guidelines, the December 20, 1998 letter clearly falls within the category of student records for which disclosure is restricted, and Campion's forwarding the letter was a clear violation of the confidentiality provisions of the IDEA. Campion and Ridgewood argue that because the letter included requests for actions to be taken by Greco and Windsor, the N.s impliedly consented to the disclosure of its contents. That argument, though not totally without foundation, is unavailing. It is true that the letter clearly contemplated, even called for, a communication of the N.s' requests to Windsor. But contents of the letter included more

than just the requests (including, for example, characterizations by the N.s of J.N.'s experiences); and the mere fact that requests were included did not imply consent to the disclosure of the entire contents of the communication.

The January 4, 1999 letter, addressed to the N.s and copied to (among others) Greco, also represented a violation of the IDEA disclosure rules. As a letter to the N.s, and particularly as a letter containing accounts of communications between the N.s and Ridgewood officials, it was clearly within the class of protected records. (Its protected status is not diminished by the fact that it was sent simultaneously to the N.s and to unauthorized recipients: in composing and sending to multiple addressees Campion simultaneously created and disclosed (unlawfully) a protected record.)

Defendant Campion argues unpersuasively that summary judgment should be granted in his favor on Count Twelve because he is entitled to qualified immunity. Campion is not shielded by qualified immunity because, both when he forwarded the N.s December 20 letter and when he sent to January 4 letter, he could not reasonably have failed to realize that he was disclosing the kind of confidential, personally identifiable information for which disclosure is restricted by the IDEA. Nor could Campion have reasonably believed that the N.'s consented to his simply forwarding to Windsor their December 20 letter requesting various remedies. Campion emphasizes the fact that the January 4, 1999 letter was reviewed by counsel before being sent out; and he suggests that counsel's apparent approval of his actions confers qualified immunity. The advice of counsel can indeed be a factor in the qualified immunity analysis. *See Castle v. Clymer*, 15 F.Supp.2d 640, 667 (E.D.Pa.1998). But in the present case it does not appear even that the attorney in question was specifically consulted about the confidentiality implications of sending the letter to recipients other than the N.s; and even if he had been consulted specifically and approved the disclosure, his advice would not absolve Campion of liability because the disclosure was such a clear violations of the IDEA rules.

### B. Inclusion in Records of Material not Based on Personal Knowledge

Again referring to the January 4, 1999 letter, Plaintiffs contend that Defendant Campion (and Ridgewood acting through him) violated the IDEA by including in J.N.'s record material not based on the personal knowledge of the person creating the record. They invoke N.J.A.C. 6.3–6.2 and N.J.A.C. 6.3–6.7. This claim is without merit because the account in the January 4 letter does not purport to represent an account of observed events involving J.N., but rather a summary of communications between various parties. Although it is not specifically clear throughout the letter, it is apparent that Campion writes from his personal knowledge, not of the historical facts discussed in those various communications, but rather of the conversations themselves. Contrary to Plaintiff's contention, the Campion letter does not imply any endorsement of the accuracy of any particular account. Accordingly, neither Campion nor Ridgewood can be liable on this claim.

### VI. Claim against Ridgewood for Failure to Enforce its Contract with Windsor (Count Nine)

In ·Count Nine of the Amended Complaint Plaintiffs assert a claim against Ridgewood for its failure to enforce the contract it had entered into with Windsor for J.N.'s benefit. Although Ridgewood's motion for summary judgment embraces all the claims asserted against it, its briefs

offer no argument specific to this count. For their part Plaintiffs also do not specify the legal theory of the claim or point specifically to evidence that might support it. Clearly the mere existence of a contract under which J.N. was to benefit from Windsor' s performance does not create any obligation running from Ridgewood to Plaintiffs: any obligation that Ridgewood had to deliver the services at issue to the N.s arose from other sources (such as the IDEA and § 504). Accordingly, because this claim is (if viable) duplicative of other claims that Plaintiffs assert, summary judgment in favor of Ridgewood is warranted on Count Nine.

### VII. Claim against Ridgewood for Violation of Equal Protection under the U.S. and New Jersey Constitutions (Count Fifteen)

■ Like Count Nine, Count Fifteen of the Amended Complaint is nominally the subject of one of the instant motions but is not discussed in the briefs. In this count Plaintiffs assert that Ridgewood violated the equal protection clauses of the U.S. and New Jersey constitutions by affording J.N. differential treatment on the basis of his placement in a private school. Summary judgment in Ridgewood's favor is appropriate on these claims because there is no substantial indication in the record that J.N.'s placement in a private school was a motivating factor of any treatment he received. It of course true that J.N.'s placement at Windsor was an essential but for causal factor in the sequence of events giving rise to Plaintiffs' asserted injuries: most obviously, if J.N. had not been enrolled at Windsor, Windsor would not have been in a position to terminate his placement. But there is no indication that, presented with the inescapable fact that Windsor had the power to effect the termination (even if it did not have the right to effect it in the way it did), Ridgewood treated the N.s adversely because J.N. had

been placed in a private school. To the extent the record supports any inference that Ridgewood's unfavorable treatment of the N.s was deliberate, it indicates that Ridgewood may have been motivated by retaliatory animus and antagonism arising from the N.s interactions with school officials; and indeed, this is the very theory of Ridgewood's motivation that Plaintiffs offer in support of their retaliation claims.

### VIII. Windsor and Greco's Cross Claim for Indemnification

■ Windsor and Greco have moved for summary judgment on cross claims for indemnification against Ridgewood, theorizing that Ridgewood bears sole responsibility for any harm incurred by Plaintiffs— at least with respect to events after January 4, 1999. Windsor and Greco's argument that any injury after January 4, 1999 resulted only from conduct of other Defendants is not conclusively supported by the record (indeed, it appears to be factually erroneous); accordingly, their motion for summary judgment on the cross claim will be denied. For example, if Windsor had not terminated J.N.'s placement in such a hasty and unlawful manner, it is entirely possible that the N.s would have filed a due process petition before the termination, and that the stay-put provision of the IDEA would have permitted J.N. to remain at Windsor until a new placement was determined. Windsor and Greco's argument that the causal link between their misconduct and the harm to N.s was somehow severed is not a basis for summary judgment.

### IX. Defendants' Justiciability Arguments

Defendants raise a number of arguments purportedly challenging Plaintiffs' standing to raise their claims and suggesting that the claims are moot. Ridgewood,

for example, contends that the N.s claims are moot because J.N. is now receiving an appropriate education. Windsor and Greco similarly argue that the claims are moot. They also purport to bring standing-based challenges that in fact largely amount to restatements of other arguments either on mootness or on the merits of Plaintiffs' claims. None of these arguments warrant summary judgment in any Defendant's favor on any otherwise viable claim.

 To have standing generally, a party must show that he or she has (1) a legally recognized injury; (2) caused by the named defendant or at least fairly traceable to the challenged action of the defendant; and (3) likely to be redressed by a favorable decision. *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 561 (3d Cir.2002). The ability of the court to provide relief must persist throughout the litigation: generally, "if developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 698–99 (3d Cir.1996). There is ample evidence in the record that the N.s have legally cognizable injuries traceable to the Defendants' conduct.

The N.s clearly have standing to assert their claims; and, equally clearly, their claims are not moot. Plaintiffs claim, with ample support in the record, that they were injured by the termination of J.N.'s placement at Windsor and by Ridgewood's deficient response to it. Their injuries are redressible both through awards of damages and through the equitable relief they seek (which includes compensatory education, letters from Defendants to J.N. on the subject of his termination, and the removal of derogatory references to the N.s from school records).[11] Because at least some relief that would redress Plaintiffs' injuries is available under each of their otherwise viable claims,[12] there is no basis for summary judgment in any Defendant's favor on justiciability grounds.

### CONCLUSION

For the reasons stated above, the pending motions will be resolved as follows:

**I. Plaintiffs' Motion for Summary Judgment against Windsor and Greco**

A. Count One: GRANTED

B. Count Two: GRANTED with respect to Windsor's liability under the IDEA and § 504; DENIED with respect to Greco

C. Count Three: DENIED

D. Count Four: GRANTED with respect to Windsor's liability; DENIED with respect to Greco

E. Count Thirteen: DENIED

Judgment will be entered in Plaintiffs' favor on Count One; on claims asserted in Count Two against Windsor under the IDEA and § 504; and on claims asserted against Windsor in Count Four.

---

**11.** Contrary to Defendants' contentions, Plaintiffs' claims for these items of equitable relief were not previously dismissed. In fact, they were specifically permitted to remain in the case in an opinion issued May 14, 2002.

**12.** Because only injunctive relief is available under the remedies provisions of Title III of the ADA (the provisions applicable to Windsor as a public accommodation), Plaintiffs may not obtain a damages award against Windsor on the basis of their ADA claim. However, Plaintiffs assert a claim for equitable relief against Windsor that is not moot; accordingly, their ADA claim against Windsor may not be dismissed as moot.

## II. Windsor and Greco's Motion for Summary Judgment

A. Count One: DENIED

B. Count Two: DENIED with respect to Windsor; GRANTED with respect to GRECO

C. Count Three: GRANTED

D. Count Four: GRANTED with respect to Greco; DENIED with respect to Windsor

E. Count Five: GRANTED with respect to claims under the IDEA and with respect to claims against Greco under the ADA; DENIED with respect to claims against Windsor under § 504 and the ADA, and with respect to claims against Greco under § 504

F. Count Six: GRANTED

G. Count Thirteen: GRANTED

H. Motion for summary judgment on the cross claim for indemnification against Ridgewood: DENIED

Judgment will be entered in Greco's favor on claims asserted in Counts Two, Three, and Four; on claims asserted in Count Five under the IDEA and the ADA; and on claims asserted in Counts Six and Thirteen. Judgment will be entered in Windsor's favor on claims asserted in Count Three; on claims asserted in Count Five under the IDEA; and on claims asserted in Counts Six and Thirteen.

## III. Plaintiffs' Motion for Summary Judgment against Ridgewood and Campion

A. Count One: GRANTED

B. Count Seven: GRANTED with respect to Ridgewood's liability under the IDEA and § 504 [13]

C. Count Eight: GRANTED with respect to Ridgewood's and Campion's liability under § 1983 for violations of the IDEA and § 504 [14]

D. Count Twelve: GRANTED with respect to Ridgewood's and Campion's liability under § 1983 for violations of the IDEA in the disclosure of confidential records; DENIED with respect to claims invoking FERPA and with respect to claims alleging the inclusion in student records of information not based on personal knowledge

Judgment will be entered in Plaintiffs' favor on Count One; on claims in Count Seven against Ridgewood under the IDEA and § 504 (for failure, on its part and on Windsor's, to abide by required procedures for a change in placement); on claims in Count Eight against Ridgewood and Campion under § 1983 for violations of the IDEA and § 504 (for their own failure to abide by required procedures for a change in placement); and on claims in Count Twelve against Ridgewood and Campion under § 1983 for violations of the IDEA in the disclosure of confidential records.

## IV. Ridgewood's Motion for Summary Judgment

A. Count One: DENIED

B. Count Five: GRANTED with respect to claims under the IDEA;

---

13. Ridgewood is liable under the IDEA and § 504 for the failure (its own and Windsor's) to provide sufficient notice of the termination of J.N.'s placement, and for its own failure to follow the proper procedures for the formulation of a new IEP (including convening a timely and proper IEP meeting). Issues of fact remain with respect to other asserted bases of IDEA and § 504 liability.

14. Ridgewood and Campion are liable on this count for their failure to follow the proper procedures for the formulation of a new IEP (including convening a timely and proper IEP meeting). Issues of fact remain with respect to other asserted bases liability.

DENIED with respect to claims under § 504 and the ADA

C. Count Six: GRANTED with respect to claims under § 1983 for violation of the IDEA; DENIED with respect to claims under § 1983 for violations of § 504 and the ADA

D. Count Seven: DENIED

E. Count Eight: DENIED

F. Count Nine: GRANTED

G. Count Twelve: DENIED with respect to Ridgewood's liability under § 1983 for violations of the IDEA in the disclosure of confidential records; GRANTED with respect to claims invoking FERPA and with respect to claims alleging the inclusion in student records of information not based on personal knowledge

H. Count Fifteen: GRANTED

Judgment will be entered in Ridgewood's favor on claims in Count Five under the IDEA; on claims in Count Six under § 1983 for violations of the IDEA; on Count Nine; on claims in Count Twelve invoking FERPA; on claims in Count Twelve alleging the inclusion in student records of information not based on personal knowledge; and on claims in Count Fifteen.

## V. Campion's Motion for Summary Judgment

A. Count One: DENIED

B. Count Five: GRANTED with respect to claims under the IDEA and the ADA; DENIED with respect to claims under § 504

C. Count Six: GRANTED with respect to claims under claims under § 1983 for violations of the IDEA; DENIED with respect to claims under § 1983 for violations of § 504 and the ADA.

D. Count Eight: DENIED

E. Count Twelve: DENIED with respect to liability under § 1983 for violations of the IDEA in the disclosure of confidential records; GRANTED with respect to claims invoking FERPA and with respect to claims alleging the inclusion in student records of information not based on personal knowledge

Judgment will be entered in Campion's favor on claims in Count Five under the IDEA and the ADA; on claims in Count Six under § 1983 for violations of the IDEA; on claims in Count Twelve invoking FERPA; and on claims in Count Twelve alleging the inclusion in student records of information not based on personal knowledge.

An appropriate order will be entered.

## VI. Claims and Issues that Remain to be Resolved

Given the dispositions set forth above and in the accompanying order, the following claims and issues have not yet been resolved (either in Plaintiffs' favor or in favor of the relevant Defendant) and remain to be tried in this case:

A. Claims against Greco

1. The claim of retaliation under § 504 (in Count Five)

B. Claims against Windsor

1. Claims of retaliation under § 504 and under the ADA (in Count Five)

2. Issues of damages and other relief with respect to those claims on which summary judgment will be entered for Plaintiffs (claims under the IDEA and § 504 in Count Two and the third party beneficiary claim in Count Four)

C. Claims against Ridgewood

1. Claims of retaliation under § 504 and the ADA (in Count Five)

2. Claims of retaliation under § 1983 for violation of § 504 and the ADA (in Count Six)

3. Issues of damages and other relief with respect to those claims on which summary judgment will be entered for Plaintiffs (claims under the IDEA and § 504 in Count Seven); under § 1983 for violations of the IDEA and § 504 in Count Eight; and claims under § 1983 for violations of the IDEA in the disclosure of confidential records in Count Twelve

4. Claims in Counts Seven and Eight (under the IDEA, under § 504, and under § 1983 for violations of the IDEA and § 504) asserting IDEA and § 504 violations other than the failure to abide by the required procedures for a change in placement

5. Cross claims against Ridgewood

D. Claims against Campion

1. The claim of retaliation under § 504 (in Count Five)

2. Claims of retaliation under § 1983 for violation of § 504 and the ADA (in Count Six)

3. Issues of damages and other relief with respect to those claims on which summary judgment will be entered for Plaintiffs (claims under § 1983 for violations of the IDEA and § 504 in Count Eight); and claims under § 1983 for violations of the IDEA in the disclosure of confidential records in Count Twelve

4. Claims in Count Eight (under § 1983 for violations of the IDEA and § 504) asserting IDEA and § 504 violations other than the failure to abide by the required procedures for a change in placement